**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

ELIZABETH RAMSEY WOLF, individually and on behalf of all others similarly situated,

Plaintiff,

v.

LEAFWELL, INC.,

Defendant.

Case No.

**CLASS ACTION**

**DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT

Plaintiff Elizabeth Ramsey Wolf ("Plaintiff") brings this Class Action Complaint ("Complaint") against Defendant Leafwell, Inc. ("Defendant"), individually and on behalf of all others similarly situated ("Class Members"), and alleges, upon personal knowledge as to her own actions, and upon information and belief and investigation of counsel as to all other matters, as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") entrusted to it by Plaintiff and Class Members.

2. Defendant is a health-tech and telehealth company focused on medical cannabis that operates a technology platform connecting patients with independently operated medical practices and licensed healthcare providers for medical-cannabis evaluations, certifications, and renewals, while also providing cannabis education, research, and patient-care services.[1]

[1] https://leafwell.com/about (last visited Sept. 3, 2026).

3. To obtain services from Defendant, Plaintiff and Class Members were required to entrust Defendant with sensitive, non-public Private Information. Defendant could not perform its regular business activities without this Private Information. Defendant retains this information for many years and even after the relationship has ended.

4. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5. Around August 11, 2026, notorious ransomware cybercriminal group "Direwolf" posted on its dark web blog site that it successfully executed a cyberattack against Defendant's network and systems ("Data Breach"). Direwolf, in its post, threatened, "The full leak will be published soon, unless a company representative contacts us via the channels provided."[2]

6. Direwolf is a dangerous, high-threat ransomware group that is distinguished by the victim-specific customization of its attacks. "Each attack employs tailored encryptors with hardcoded room IDs, unique credentials, and personalized negotiation portals. This customization indicates reconnaissance spanning days to weeks between initial breach and encryption deployment, with proof-of-exfiltration samples prepared in advance and hosted on gofile.io."[3]

7. The Private Information exfiltrated in the Data Breach includes, upon information and belief and due to the nature of the services that Defendant provides, sensitive PII, including but not limited to Social Security numbers, and PHI.

---

[2] https://www.dexpose.io/direwolf-ransomware-attack-on-leafwell/ (last visited Sept. 3, 2026); *see also* https://www.hookphish.com/blog/ransomware-group-direwolf-hits-leafwell/ (last visited Sept. 3, 2026); https://socradar.io/data-breach/leafwell-direwolf-ransomware-2026/ (last visited Sept. 3, 2026).

[3] https://www.halcyon.ai/threat-group/dire-wolf (last visited Sept. 3, 2026).

8. Defendant failed to adequately protect the Private Information of Plaintiff and Class Members—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect Plaintiff's and Class Members' sensitive data. Hackers targeted and obtained the Private Information because of its value in exploiting and stealing the identities of Class Members and to conduct financial crimes against Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

9. Upon information and belief, Plaintiff's Private Information is available on the dark web as a result of the Data Breach.

10. In breaching its duties to properly safeguard Plaintiff's and Class Members' Private Information, Defendant's conduct amounts to negligence and/or recklessness and violates federal and state statutes.

11. Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts at least to negligence and violates federal and state statutes.

12. Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiff and Class Members was safeguarded,

failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party. Plaintiff and Class Members have a continuing interest in ensuring that their Private Information is and remains safe, and they are entitled to injunctive and other equitable relief.

13. Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) Plaintiff's Private Information being disseminated on the dark web; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

14. Plaintiff and Class Members seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## PARTIES

15. Plaintiff is and has been, at all relevant times, a resident and citizen of Plymouth, Massachusetts, where she intends to remain.

16. Defendant is a Delaware corporation maintaining its principal place of business at 9100 S. Dadeland Blvd, Ste. 1701, Miami, Florida 33156.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant, namely, Plaintiff, a citizen of Massachusetts.

18. This Court has personal jurisdiction over Defendant because its principal place of business is in this District, it regularly conducts business in this District, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

19. Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## FACTUAL BACKGROUND

### A. *Defendant's Business*

20. Defendant is a health-tech and telehealth company focused on medical cannabis that operates a technology platform connecting patients with independently operated medical practices and licensed healthcare providers for medical-cannabis evaluations, certifications, and renewals, while also providing cannabis education, research, and patient-care services.[4]

---

[4] https://leafwell.com/about (last visited Sept. 3, 2026).

21. Plaintiff and Class Members were required to entrust Defendant with sensitive, non-public Private Information in connection with the services Defendant provides.

22. The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class Members.

23. Upon information and belief, and through its privacy policy ("Privacy Policy"),[5] Defendant made promises and representations to Plaintiff and Class Members that the Private Information collected in connection with the services Defendant provides would be kept safe and confidential, and that Defendant would implement appropriate technical and organizational measures to protect the Private Information.

24. Plaintiff and Class Members provided the Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

25. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

26. Plaintiff and Class Members relied on the sophistication of Defendant to keep the Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information.

[5] https://leafwell.com/privacy-policy (last visited Sept. 3, 2026) ("We only process and retain your personal information as permitted under applicable law... We will usually store the personal information we collect about you for no longer than necessary for the purposes set out in this Privacy Notice, and in accordance with our legitimate business interests and applicable law… We implement appropriate technical and organizational measures to protect your personal information against accidental or unlawful destruction, loss, change or damage. Leafwell protects your personal information, such as electronic medical records, on servers with strictly controlled and encrypted access. All personnel are highly trained prior to being granted access, and may only do so via our secure channels. We will never send you unsolicited emails or contact you by phone requesting your account ID, password, credit or debit card information or national identification numbers.").

27. Plaintiff and Class Members value the confidentiality of the Private Information and demand security to safeguard their Private Information.

28. Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep Plaintiff's and Class Members' Private Information safe and confidential.

29. Defendant had obligations created by the FTC Act, HIPAA, contract, industry standards, and representations made to keep the Private Information confidential and to protect it from unauthorized access and disclosure.

30. Defendant derived a substantial economic benefit from collecting Private Information from Plaintiff and Class Members. Without the required submission of Private Information, Defendant could not perform the services it provides.

31. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from disclosure.

**B. *The Data Breach***

32. Around August 11, 2026, notorious ransomware cybercriminal group "Direwolf" posted on its dark web blog site that it successfully executed a cyberattack against Defendant's network and systems. Direwolf, in its post, threatened, "The full leak will be published soon, unless a company representative contacts us via the channels provided."[6]

33. Direwolf is a dangerous, high-threat ransomware group that is distinguished by the victim-specific customization of its attacks. "Each attack employs tailored encryptors with

---

[6] https://www.dexpose.io/direwolf-ransomware-attack-on-leafwell/ (last visited Sept. 3, 2026); *see also* https://www.hookphish.com/blog/ransomware-group-direwolf-hits-leafwell/ (last visited Sept. 3, 2026); https://socradar.io/data-breach/leafwell-direwolf-ransomware-2026/ (last visited Sept. 3, 2026).

hardcoded room IDs, unique credentials, and personalized negotiation portals. This customization indicates reconnaissance spanning days to weeks between initial breach and encryption deployment, with proof-of-exfiltration samples prepared in advance and hosted on gofile.io."[7]

34. The Private Information exfiltrated in the Data Breach includes, upon information and belief and due to the nature of the services that Defendant provides, sensitive PII, including but not limited to Social Security numbers, and PHI.

35. Defendant failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

36. The attacker accessed and acquired files in Defendant's computer systems containing unencrypted Private Information of Plaintiff and Class Members.

37. Upon information and belief, Plaintiff's Private Information has been disseminated on the dark web, and Plaintiff further believes that the Private Information of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals such as Direwolf that commit cyber-attacks of this type.

**C. *Data Breaches Are Preventable***

38. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[8]

---

[7] https://www.halcyon.ai/threat-group/dire-wolf (last visited Sept. 3, 2026).
[8] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

39. To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[9]

40. To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection

---

[9] *Id.* at 3-4.

- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[10]

41. Defendant had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite its obligation to protect such information.

42. Given that Defendant was storing the sensitive Private Information of Plaintiff and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

43. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and, upon information and belief, the exposure of the Private Information of Plaintiff and Class Members.

**D. *Defendant Acquires, Collects, and Stores Sensitive Private Information***

44. As a condition of obtaining services from Defendant, Plaintiff and Class Members were required to provide sensitive and confidential Private Information to Defendant.

45. Defendant retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for its collection of Plaintiff's and Class Members' Private Information, Defendant would be unable to perform its services.

46. By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the Private Information from disclosure.

---

[10] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

47. Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of the Private Information and relied on Defendant to keep the Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

48. Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members.

49. Upon information and belief, and through its Privacy Policy, Defendant made promises and representations that it would maintain and protect the Private Information, demonstrating an understanding of the importance of securing Private Information.

**E. *Defendant Knew or Should Have Known of the Risk Because Entities in Possession of Private Information are Particularly Susceptible to Cyber Attacks***

50. Data thieves regularly target entities in possession of sensitive data like Defendant due to the highly sensitive information that they have in their custody.

51. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

52. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities that collect and store Private Information, like Defendant, preceding the date of the breach.

53. In the third quarter of the 2023 fiscal year alone, 7,333 organizations experienced data breaches, resulting in 66,658,764 individuals’ personal information being compromised.[11]

---

[11] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/ (last visited Sept. 3, 2026).

54. In 2024, these numbers held steady - a record 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records (i.e., a 211% increase year over year).[12] From 2018 until 2023, companies maintaining sensitive PHI, such as Defendant, experienced the most data breaches among all measured industries.[13] In 2024, the healthcare industry was the second most targeted industry for data compromises behind only financial services.[14]

55. Additionally, in 2024, healthcare data breaches reached an all-time high, with 276,775,457 records compromised – a 64.1% increase from the previous year's record and equivalent to 81.38% of the United States population.

56. In light of recent high profile cybersecurity incidents at other companies in possession of Private Information, including, *e.g.*, American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), BJC Health System (286,876 patients, March 2020), 23andMe, Inc. (20 million records, October 2023), Change Healthcare Inc. (145 million records, February 2024), Kaiser Foundation Health Plan, Inc. (13 million records, April 2024), Ascension Health (5.6 million records, May 2024), HealthEquity, Inc. (4.3 million records, March 2024), and Acadian Ambulance Service, Inc. (2.8 million records, June 2024), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

---

[12] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.
[13] *Id.*
[14] *Id.*

57. As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

58. Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[15]

59. Additionally, as companies became more dependent on computer systems to run their business,[16] *e.g.*, working remotely as a result of the COVID-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[17]

60. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

61. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the

---

[15] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection (last visited Sept. 3, 2026).

[16] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html (last visited Sept. 3, 2026).

[17] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022 (last visited Sept. 3, 2026).

foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

62. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

63. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

64. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

65. As an entity in possession of Plaintiff's and Class Members' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

**F. *The Value of Private Information***

66. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[18] The FTC describes "identifying information" as "any name or number that may be used, alone or

[18] 17 C.F.R. § 248.201 (2013).

in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[19]

67. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[20]

68. For example, Private Information can be sold at a price ranging from $40 to $200.[21] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[22]

69. As a growing number of federal courts have begun to recognize the loss of value of Private Information as a viable damages theory, the sale of Private Information from data breaches, as in the Data Breach alleged herein, is particularly harmful to data breach victims – especially when it takes place on the dark web.

70. The dark net is an unindexed layer of the internet that requires special software or authentication to access.[23] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on

---

[19] *Id.*

[20] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[21] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[22] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

[23] *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Sept. 3, 2026).

the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[24] This prevents dark web marketplaces from being easily identifiable to authorities or those not in the know.

71. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, sensitive personal information like the Private Information at issue here.[25] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth and other personal information.[26] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others." [27]

72. Plaintiff's and Class Members' Private Information is a valuable commodity, a market exists for Plaintiff's and Class Members' Private Information (which is why the Data Breach was perpetrated in the first place), and Plaintiff's and Class Members' Private Information is likely being sold by hackers on the dark web (as that is the *modus operandi* of data thieves such as Direwolf) – as a result, Plaintiff and Class Members have lost the value of their Private Information, which is sufficient to plausibly allege injury arising from a data breach.

---

[24] *Id.*
[25] *What is the Dark Web?* – Microsoft 365, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited Sept. 3, 2026).
[26] *Id.*; *What Is the Dark Web?,* Experian, *available at* https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Sept. 3, 2026).
[27] *What is the Dark Web?* – Microsoft 365, *available at* https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited Sept. 3, 2026).

73. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[28] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[29] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60.00 a year.[30]

74. The Private Information potentially stolen in this specific Data Breach was particularly harmful.

75. Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life. The popular personal privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including: 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts," and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft; and 5) Utility Fraud.

76. It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers, which were compromised in

---

[28] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Sept. 3, 2026).
[29] https://datacoup.com/ (last visited Sept. 3, 2026).
[30] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Sept. 3, 2026).

the Data Breach, are among the worst kinds of private information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.

77. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [31] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[32]

78. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[33]

79. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[34] "Someone who has your SSN can use it to

---

[31] *See* https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases. (last visited Sept. 3, 2026)

[32] *Id.*

[33] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Sept. 3, 2026)

[34] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited Sept. 3, 2026)

impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[35]

80. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

81. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[36]

82. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols*., No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves"

[35] *See* https://www.investopedia.com/terms/s/ssn.asp (last visited Sept. 3, 2026)

[36] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Sept. 3, 2026).

because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks.")

83. Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[37]

84. The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.,* patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, Private Information is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the healthcare industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

85. Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[38] Indeed, during 2019 alone, over 41 million healthcare records were exposed,

[37] *Medical I.D. Theft*, EFraudPrevention https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected. (last visited Sept. 3, 2026).
[38] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/ (last visited Sept. 3, 2026).

stolen, or unlawfully disclosed in 505 data breaches.[39] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[40]

86. According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.

87. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[41]

88. A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[42] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[43]

89. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data

---

[39] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last visited Sept. 3, 2026).

[40] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches (last visited Sept. 3, 2026).

[41] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-identity-theft/ (last visited Sept. 3, 2026).

[42] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited Sept. 3, 2026).

[43] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited Sept. 3, 2026)

breach because, there, victims can cancel or close credit and debit card accounts. The information likely compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

90. Private Information can be used to distinguish, identify, or trace an individual's identity. This can be accomplished alone, or in combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[44]

91. Among other forms of fraud, using the Private Information, identity thieves may obtain driver's licenses, government benefits, and housing or even give false information to police.

92. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[45]

93. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

**G. *Defendant Fails to Comply with FTC Guidelines***

---

[44] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1.
[45] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf.

94. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

95. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[46]

96. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[47]

97. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

98. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect sensitive data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an

---

[46] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf.
[47] *Id.*

unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

99. These FTC enforcement actions include actions against entities in possession of Private Information, like Defendant. *See, e.g., In the Matter of LabMD, Inc., a corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

100. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

101. Defendant failed to properly implement basic data security practices.

102. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

103. Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of Plaintiff and Class Members. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private

Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class Members.

**H. *Defendant Fails to Comply with HIPAA Guidelines***

104. Defendant is covered under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

105. Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[48] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

106. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

107. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

108. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

---

[48] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

109. "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

1. HIPAA's Security Rule requires Defendant to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

110. HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

111. Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

112. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not

permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

113. HIPAA requires Defendant to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

114. HIPAA also requires the Office for Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[49] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[50]

**I. *Defendant Fails to Comply with Industry Standards***

---

[49] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html. (last visited Sept. 3, 2026)

[50] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html. (last visited Sept. 3, 2026)

115. As noted above, experts studying cyber security routinely identify entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of Private Information which they collect and maintain.

116. Several best practices have been identified that, at a minimum, should be implemented by entities in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

117. Other best cybersecurity practices that are standard in the industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

118. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

119. These foregoing frameworks are existing and applicable industry standards, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**J. *Defendant Breached its Duty to Safeguard Plaintiff's and Class Members' Private Information***

120. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in sharing, obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Plaintiff and Class Members.

121. Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect Plaintiff's and Class Members' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to sufficiently train its employees regarding the proper handling of Plaintiff's and Class Members' Private Information;

e. Failing to fully comply with FTC and HIPAA guidelines for cybersecurity in violation of the FTCA and HIPAA; and

f. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

122. Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

123. Had Defendant remedied the deficiencies in its information storage and security systems or those of its vendors and affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

**K. *Common Injuries and Damages***

124. As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's

possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

**L. *The Data Breach Increases Victims' Risk of Identity Theft***

125. The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web, as that is the *modus operandi* of hackers such as Direwolf.

126. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Simply, unauthorized individuals can easily access Plaintiff's and Class Members' Private Information that Defendant stored and maintained.

127. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

128. Plaintiff's and Class Members' Private Information that Defendant stored and maintained is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Class Members and to profit off their misfortune.

129. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[51]

[51] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone

130. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

131. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

132. The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like insurance information) of Plaintiff and the other Class Members.

133. Thus, even if certain information (such as insurance information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

134. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**M. *Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

---

with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.

135. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual becomes aware that their Private Information was compromised, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

136. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions including, but not limited to: researching and verifying the legitimacy of the Data Breach, contacting credit bureaus to place freezes, and changing passwords and resecuring their own computer networks.

137. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[52]

138. Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[53]

---

[52] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[53] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.

139. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face substantial costs and time to repair the damage to their good name and credit record.

**N. *Diminution of Value of Private Information***

140. Private Information is a valuable property right.[54] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

141. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[55]

142. An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[56]

143. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[57,58] Consumers who agree to provide their web

---

[54] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[55] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[56] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[57] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Sept. 3, 2026).

[58] https://datacoup.com/ (last visited Sept. 3, 2026).

browsing history to the Nielsen Corporation can receive up to $60.00 a year.[59]

144. As a result of the Data Breach, Plaintiff's and Class Members' Private Information that Defendant stored and maintained, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

145. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

146. The fraudulent activity resulting from the Data Breach may not come to light for years.

147. Plaintiff and Class Members now face years of constant surveillance of financial and personal records, monitoring, and loss of rights. Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

148. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

[59] https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Sept. 3, 2026).

149. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

**O. *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

150. Given the type of targeted attack in this case, the sophisticated criminal activity, the sensitive type of Private Information involved in this Data Breach, and the Private Information already being disseminated on the dark web, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

151. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

152. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

153. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

**P. *Plaintiff's Experience***

154. In order to obtain services from Defendant, Plaintiff was required to provide her Private Information to Defendant.

155. At the time of the Data Breach, Defendant retained Plaintiff's Private Information in its system. Plaintiff is a victim of the Data Breach.

156. Plaintiff is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendant had she known of Defendant's lax data security policies.

157. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach and on other necessary mitigation efforts. Plaintiff has spent significant time on mitigation activities in response to the Data Breach-valuable time that Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

158. Plaintiff suffered actual injury from having the Private Information she provided to Defendant compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains

backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

159. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

160. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

161. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

162. Since the Data Breach occurred, Plaintiff has experienced a significant uptick in spam emails. As a result of the timing of the Data Breach and this surge in spam, Plaintiff believes the increase in spam is as a result of criminals acquiring her Private Information in the Data Breach.

163. Plaintiff has a continuing interest in ensuring that the Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**CLASS ACTION ALLEGATIONS**

164. Pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and on behalf of all members of the proposed class defined as:

> Nationwide Class: All individuals whose Private Information was accessed and/or acquired by an unauthorized party in the Data Breach (the "Class").

165. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which

Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their staff and immediate family members.

166. Plaintiff reserves the right to amend the definition of the Class or add a class or subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

167. Numerosity: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. The number of individuals affected has not been publicly disclosed at this time; however, upon information and belief, potentially more than thousands of individuals are affected by the Data Breach.

168. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual members of the Classes are the following:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant had respective duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant had respective duties not to use the Private Information of Plaintiff and Class Members for non-business purposes;

d. Whether Defendant failed to adequately safeguard the Private Information of Plaintiff and Class Members;

e. Whether and when Defendant actually learned of the Data Breach;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

g. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h. Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct; and,

i. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

169. Typicality: Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach and the same alleged violations by Defendant.

170. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinge on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

171. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that she has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the

Class Members and the infringement of the rights and the damages she has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

172. Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

173. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

174. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

175. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

176. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members and Defendant may continue to act unlawfully as set forth in this Complaint.

177. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

178. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b. Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

c. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

d. Whether Defendant failed to take commercially reasonable steps to safeguard Class Members' Private Information; and

e. Whether adherence to FTC and HIPAA data security recommendations and measures recommended by data security experts would have reasonably prevented the Data Breach.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

179. Plaintiff incorporates by reference all of the allegations contained in paragraphs 1 through 178, as if fully set forth herein.

180. Defendant required Plaintiff and Class Members to submit non-public Private Information to Defendant in the ordinary course of providing its services.

181. Defendant gathered and stored the Private Information of Plaintiff and Class Members as part of its business of soliciting its services, which solicitations and services affect commerce.

182. Plaintiff and Class Members entrusted Defendant with the Private Information with the understanding that Defendant would safeguard the information.

183. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

184. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer network property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the

information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time.

185. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

186. Defendant's duties to protect Private Information pursuant to HIPAA also form a part of the basis of Defendant's obligation to use reasonable measures to protect confidential data from unauthorized disclosure.

187. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

188. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendant with the confidential Private Information, a necessary part of receiving services from Defendant.

189. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

190. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

191. Defendant also had a duty to exercise appropriate clearinghouse practices to remove individuals' Private Information that it was no longer required to retain pursuant to regulations.

192. Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

193. Defendant had and continues to have a duty to adequately disclose that the Private Information provided to it by Plaintiff and the Class might have been compromised, how it was compromised, and precisely the types of data that were compromised and when.

194. Defendant breached its duties, pursuant to the FTC Act, HIPAA, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems;

c. Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect in a timely manner that Class Members' Private Information had been compromised;

f. Failing to remove Plaintiff's and Class Members' Private Information it was no longer required to retain pursuant to regulations; and,

g. Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the Data Breach.

195. Defendant violated Section 5 of the FTC Act and HIPAA by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

196. Plaintiff and Class Members were within the class of persons the FTC Act and HIPAA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm this statute was intended to guard against.

197. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

198. Defendant's violations of Section 5 of the FTC Act and HIPAA constitute negligence.

199. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches targeting entities that collect and store Private Information.

200. Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

201. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

202. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

203. Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

204. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

205. Defendant can not deny and has not denied that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

206. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

207. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable

care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

208. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of the Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) the Private Information being disseminated on the dark web; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

209. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

210. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of the Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

211. Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

212. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

213. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, among other things, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**Negligence *Per Se***
**(On behalf of Plaintiff and the Class)**

214. Plaintiff incorporates by reference all of the allegations contained in paragraphs 1 through 178, as if fully set forth herein.

215. Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, and HIPAA, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

216. Defendant breached its duties to Plaintiff and Class Members under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

217. The injuries to Plaintiff and Class Members resulting from the Data Breach were directly and indirectly caused by Defendant's violation of the statutes described herein.

218. Plaintiff and Class Members were within the class of persons the FTC Act and HIPAA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statutes were intended to guard against.

219. Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se.*

220. But for Defendant's wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

221. The injuries and harms suffered by Plaintiff and Class Members were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

222. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injuries and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**COUNT III**
**Breach of Implied Contract**
**(On behalf of Plaintiff and the Class)**

223. Plaintiff incorporates by reference all of the allegations contained in paragraphs 1 through 178, as if fully set forth herein.

224. Plaintiff and the Class entrusted their Private Information to Defendant in connection with the services Defendant provides. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information and to keep such information secure and confidential.

225. At the time Defendant acquired the Private Information of Plaintiff and the Class, there was a meeting of the minds and a mutual understanding that Defendant would safeguard the Private Information and not take unjustified risks when storing the Private Information.

226. Implicit in the agreements between Plaintiff and Class Members and Defendant to provide Private Information was the latter's obligation to: (a) use such Private Information for business purposes only, (b) take reasonable steps to safeguard that Private Information, (c) prevent unauthorized disclosures of the Private Information, (d) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, and (e) retain the Private Information only under conditions that kept such information secure and confidential.

227. Plaintiff and the Class would not have entrusted their Private Information to Defendant had they known that Defendant would make the Private Information internet-accessible, not encrypt sensitive data elements, and not delete the Private Information when Defendant no longer had a reasonable need to maintain it.

228. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

229. Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal information.

230. As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Class have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports;

expenses and/or time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

231. As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages to be determined at trial.

**COUNT IV**
**Unjust Enrichment**
**(On behalf of Plaintiff and the Class)**

232. Plaintiff incorporates by reference all of the allegations contained in paragraphs 1 through 178, as if fully set forth herein.

233. This Count is brought in the alternative to Count III, Breach of Implied Contract.

234. Plaintiff and Class Members conferred a monetary benefit on Defendant by providing Defendant with their valuable Private Information. In so conferring this benefit, Plaintiff and Class Members understood that part of the benefit Defendant derived from the Private Information would be applied to data security efforts to safeguard the Private Information.

235. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information.

236. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

237. Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members,

because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

238. Defendant acquired the monetary benefit and Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

239. If Plaintiff and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

240. Plaintiff and Class Members have no adequate remedy at law.

241. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

242. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

243. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them.

**PRAYER FOR RELIEF**

Plaintiff and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying the Class, as defined herein, and appointing Plaintiff and her Counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information Plaintiff and Class Members provided to it;

C. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

    iii. requiring Defendant to delete, destroy, and purge the Private Information Plaintiff and Class Members provided to it unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information Plaintiff and Class Members provided to it;

v. prohibiting Defendant from maintaining the Private Information Plaintiff and Class Members provided to it on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix. requiring Defendant to conduct regular database scanning and securing checks;

x. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as

well as protecting the Private Information Plaintiff and Class Members provided to it;

xi. requiring Defendant to conduct internal training and education routinely and continually, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii. requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

xv. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: September 3, 2026

Respectfully Submitted,

*/s/ Tonyia Johnson*
Tonyia J. Johnson (FBN 1058251)
**SHAMIS & GENTILE, P.A.**
14 NE First Avenue, Suite 705
Miami, Florida 33132
Tel: (305) 479-2299
tjohnson@shamisgentile.com

*Attorney for Plaintiff and the Putative Class*